THOMAS C. CLARK, Appellant, *against* THE MECHANICS' NATIONAL BANK OF THE CITY OF NEW YORK, Respondent.

(Decided January 20th, 1880.)

Under the provisions of § 999 of the Code of Procedure, that " the judge presiding at a trial by a jury may, in his discretion, entertain a motion made upon his minutes at the same term to set aside the verdict and grant a new trial * * * because the verdict is * * * *contrary to the evidence,*" the judge may, upon a motion so made upon his minutes, set aside a verdict because it is against *the weight* of evidence.

On appeal from an order granting a new trial the revisory jurisdiction of the appellate tribunal is not limited to a review only of the grounds upon which the court below ordered a new trial, but the order will be sustained if it ought to have been granted on any of the grounds upon which the motion for it was made

*Morse* v. *Sherrill* (63 Barb. 21) and *Tinson* v. *Welsh* (51 N. Y. 244) on this point distinguished.

The plaintiff brought an action against the defendant (a bank with which he had been a depositor) to recover $27,149 90, claimed to be the balance of his deposit, but which the defendant claimed to have paid out on twenty-three checks drawn by him, but which they were unable to produce. It appeared in evidence that these checks were charged against his account in 1864, and that he became aware

that such charges had been made, and that the vouchers therefor were missing in 1865, and that he made no formal demand upon the bank for payment to him of such amount nor brought any action to recover it until eleven years afterwards, although during the whole of that time he continued to be a customer of the bank, and his bank book during that time had been balanced twenty-three times. The plaintiff swore that as soon as he became aware that the charge had been made against his account and that the vouchers were missing he objected to the charge and sought to have the vouchers produced or the account altered, but was put off from time to time by the officers of the bank until the suit was brought. It appeared that though the plaintiff was in business in New York City as a wholesale and retail grocer, doing, as he testified, a large business during the period when the missing checks were paid, he kept no cash book and made no entry of his payments in any book, and could give no account of any of his business transactions during that period, claiming that all his books and papers for that period were lost. The defendant proved that the missing checks were received and paid by it in the ordinary course of business. The plaintiff did not swear that he had not drawn the missing checks, but swore he had never drawn checks for the amounts charged against him. In regard to two of the missing checks, it was proved that they were presented by persons with whom the plaintiff at the time was doing business, and were for amounts which he owed and had paid them at that time, and there was also some evidence indicating that three other of the missing checks had been given in payment of claims due by the plaintiff to persons with whom at the time he dealt. It was shown by the defendant, by the person who had been its check clerk at the time when the checks were charged against the plaintiff's account, and who had entered the bulk of the plaintiff's checks from the time that he had opened his account eight years before, and who had therefore become familiar with the plaintiff's handwriting and knew his signature, that this clerk received nineteen of the missing checks in the regular course of business and entered them, the signatures of which he recognized at the time to be in the handwriting of the plaintiff, and that they came to him from the paying-teller, who was dead at the time of the trial, by whom they had previously been examined and passed, and that the remaining four missing checks came into the possession of the assistant paying-teller, being received by him in the regular course of business from the paying-teller and entered by him at the dates when they were received, the signatures to which he then, and on the trial, believed to have been in the handwriting of the plaintiff, he also being familiar with the plaintiff's handwriting. At the time when the missing checks were paid the plaintiff was a man in comparative affluence, but at the time of the trial had become so reduced in circumstances as to have no property except what he wore upon his person, and when examined under oath as to whether he had any property to satisfy an execution against him, made no disclosure of the existence of this claim against the bank. Upon this and other evidence of a minor character the plaintiff recovered a verdict for the full amount claimed.

*Held*, that the verdict was clearly against the weight of evidence, and that it was properly set aside, upon that ground.

APPEAL from an order made by the judge before whom the case was tried granting, upon a motion made upon his minutes, a new trial and setting aside the verdict.

The action was brought to recover a balance of deposit made by the plaintiff with the defendant, and interest thereon.

The defendant claimed to have paid out the whole balance on checks drawn by the plaintiff.

Judge JOSEPH F. DALY presided at the trial, and in the charge presented the question of fact to the jury as follows:

" Gentlemen of the Jury.—The claim of the plaintiff in this action is for $27,149 90, the amount of twenty-three checks charged against him at the balancing of his account upon his pass-book on September 14th, 1865. The question in this case is, were those checks so charged against him drawn by him or not? It appears that the course of business in the bank as to charging the drafts of their dealers is as follows :—The checks of dealers come to the bank in three ways, one is through the clearing house from other banks · another is through the receiving-teller in deposits of checks made by other dealers with the bank, and the third way is through the paying-teller over the counter. The checks of dealers which do not come through the paying-teller over the counter are, after they have been received in the bank, submitted to him for his authentication. Doubtful checks or forged checks are laid aside, and the checks passed by the paying-teller as genuine are handed to the check clerks. They enter the checks, as to amounts and the parties from whom they come, in what is called a check list, kept in books. The same checks are then passed over to the check clerks, who enter them in the debit book, which contains the amount of the check and the name of the drawer. After being entered in the check list, they are sorted according to the dealers, and are entered against the dealers in the debit book. The charges upon the ledger of the bank are made from the debit book. The checks themselves, after being entered in the check-book, are handed to the book-keeper to place them in pigeon-holes alphabetically arranged for their

reception and custody.  There they stay until the book of the dealer is to be balanced, when the checks are taken out and the entries upon the pass-book made from the checks. The book-keeper then compares the pass-book with the ledger and balances the book from that examination.

" This being the course of business in the bank, the bank proceeds, as it is bound to do, to show how it came in the course of its business to charge against the plaintiff (the dealer) these twenty-three checks.  They show, first, that checks corresponding in amount to those charged against him appear on their check list of July, August, September, and October, 1864; that these lists were made up from the actual checks, and the entries in the book were made in the handwriting of Messrs. Dennison, Hoffman and Brinckerhoff, clerks of the bank, who have identified those entries on the witness stand.  They show next, that checks corresponding in amount to the missing vouchers and to the entries in the check-list appear in the book of debits made up day by day from the original checks; that these entries in the debit book correspond in dates to the entries of similar amounts in the check-list, and that they are in the handwriting of Hoffman and Brinckerhoff, who identified them.  They show that checks corresponding in amount and in the order shown in the debit book and check-list appear on the pass-book of plaintiff in the handwriting of Wright, a clerk of the bank, who identifies this handwriting, and says he made these from the checks themselves.  This is all direct and positive evidence that checks signed " Thos. C. Clark " were in existence at the time, and were handed to, and were entered in these books by these clerks.

" Now, these checks have disappeared.  You have heard the evidence of the search made for them, and that they cannot be found.  We are left, of course, with nothing but surmise as to what has become of them, and in what way they have disappeared.  The plaintiff swears that none of these checks were drawn by him.  Upon the part of the defendants the evidence of Mr. Charles Hoffman, who was a check clerk in 1864 in the bank, is, that he had handled the plain-

tiff's checks since 1856, and was acquainted with his signature, and that he entered on the debit book, to which I have alluded, nineteen of these twenty-three contested vouchers —namely, all except the seventh, eighth, fourteenth and fifteenth—in order. He handled the checks so entered, swears that the signatures to them were in the handwriting of the plaintiff, and that he recognized it as such. They next produce, in corroboration of this testimony, and of the genuineness of the four checks entered in the debit book by Mr. Brinckerhoff, evidence going to show that six of these contested checks came in the regular course of business from other banks, and were deposited in such other banks immediately prior to their appearance in the Mechanics' Bank, and were so deposited by persons with whom the plaintiff dealt at that time—namely, Demarest & Wygant, Kingsland & Comstock, Sayre & Brother, and Meyer & Strauss. In the case of Demarest & Wygant, evidence is given to show that the plaintiff, on the date in question, is credited on the books of the firm in the handwriting of Wygant, one of the partners, with the payment of the exact amount so deposited by that firm, and so charged among those original vouchers.

" Now, gentlemen, that presents in about as short and concise a form as I could put it, the evidence in this case upon which the jury is to determine whether these twenty-three checks were drawn by the plaintiff or not. All outside of this is a matter or argument, or of inference, or of reasoning from attendant circumstances. That is just as important an element, and these inferences and these circumstances are to be considered as much as those circumstances that I have alluded to. This jury may consider, from its knowledge of business and its knowledge of men, and its knowledge of the course of business, all these facts and everything connected with these dealings, and the circumstances of this case, for the purpose of ascertaining where the preponderance lies between the parties. To go farther than this—to take up each one of these circumstances, the question of delay, the question of demand, the question of the plaintiff keeping or not keeping books, the question of the loss of the

vouchers—any of the circumstances on the one side or the other, would draw me insensibly into a discussion of the weight of these circumstances, and lead me unintentionally, perhaps, to lay greater stress upon one fact than upon another. Now, I forbear running the risk of doing so, because this jury is to be the judge of the facts; and as this case involves almost altogether a question of fact, I mean that this tribunal shall decide it entirely, unbiassed by any observation of mine. I am here more to preside over your deliberation than for any other purpose; to see that the proper evidence is laid before you on which you are to make up your minds. Further than that I will not go.

\* .\* \* \* \* \* \* \* \* \*

" Now the question of the amount due to the plaintiff, in any event, as far as interest is concerned, I will relieve of embarrassment by saying that he would in no event be entitled to interest before the time that he had made his demand for the purpose of bringing this action."

The jury found a verdict for the plaintiff for $31,874 73.

On a motion made on his minutes for a new trial, Judge JOSEPH F. DALY wrote the following opinion :—

" The action was brought by Thomas C. Clark to recover of the defendants, The Mechanics' National Bank of New York, the sum of $27,149 70, which he claimed to be due him over and above his drafts on the bank. This sum was charged against him by the bank on balancing his pass-book. of date September 14th, 1865, and is the total of twenty-three checks, which the bank alleged to be his, which they paid as his, but which, having been lost, mislaid or stolen, were not returned to him at the time of such balance, and have never been produced. The plaintiff recovered a verdict for the amount of all the missing checks. The jury were instructed that the question for them to determine was, whether the checks so charged against the plaintiff's account were his. By their verdict, their finding was, of course, that none of those checks were his. This finding seems to me clearly against the evidence in the case. The facts disclosed are interesting, and merit a brief statement.

"The plaintiff, Thomas C. Clark, was engaged in the wholesale and retail grocery and provision business, at Nos. 22 and 24 Amity Street, in this city, from 1855 to 1865. He sold out in January of that year. He seems to have gone out of business with considerable means, and for the ensuing ten years, down to 1875, engaged in no regular occupation. By the end of that period, however, he had, by ill-judged speculation and investment, lost all his money and property.

"It was at this later period that he made the first and only demand of the bank for the amount which he alleged they had over-charged ten years before! During all of that time he had been a depositor with the bank, continuing his account without interruption from his commencing business in 1855 down to 1875. From the time of the alleged improper charge in 1865 to the time of the demand his account had been balanced and settled twenty-three times, on the basis of such charge. These balances or settlements appear upon the plaintiff's pass-book, and there is nothing *in that book* or *the books of the bank*, nor any record whatever, to show that the settlement of September 14th, 1865, in which the missing checks were charged against the plaintiff, or the subsequent twenty-three settlements were ever disputed or questioned. It is *upon the unsupported oath* alone of the plaintiff that his case rests, both as to the denial of the checks and as to matters avoiding the force and effect of so many *stated accounts* between the bank and himself. His tale, as told by him upon the stand, is substantially as follows:—

"On June 11th, 1864, his account was balanced in the book by the book-keeper at the bank, and the balance correctly entered in his favor at $394 44. About sixty days after that date he again left his book with the book-keeper, Mr. Porter, at the bank, to have his account written up; his custom usually being to have it balanced every sixty or ninety days. Over a year elapsed before he got it back with the account written up. During that period whenever he had occasion to make a deposit he had to go to the book-keeper and get his book. *Each time* he did so, he asked Porter why it was not balanced, and was told by the latter that he was

" in a hurry, that he was too busy, and so on." At length, on September 9th, 1865, plaintiff went to make a deposit of $1411 03, and asked the book-keeper for his book. The book-keeper said he hadn't it, but had given it to him. Plaintiff insisted that the book-keeper had it. Then the latter left his desk, and returned shortly afterwards with the book. The plaintiff made his deposit, and then went back to the book-keeper and handed him the book again, and ordered him to balance it. A few days after this the plaintiff went to the book-keeper and received the pass-book written up and balanced to September 14th, 1865. A balance was shown to his credit of $2151 49; the amount of deposits credited to him was $56,864 76; the difference between that sum and the balance was charged in seventy-two checks, forty-nine of which were returned to him with the pass-book, and twenty-three marked in the book as " missing," these twenty-three marked as " missing " were the first charged in the book and their amounts and order was as follows :—

| $769 81 | $400 | $473 |
| 326 | 544 | 1032 |
| 92 | 416 | 636 |
| 119 46 | 7000 | 7500 |
| 1000 | 777 | 271 |
| 702 | 105 | 714 |
| 436 | 1300 | 410 63 |
| 936 | 1200 | |

" The first thing the plaintiff saw was the amount of the balance, and he said to the book-keeper, " What have you been doing with my money ? " Porter, the book-keeper, said, " Why, did you think you had a larger balance ? " The plaintiff said, " No, I was sure of it." Porter inquired, " How much did you suppose it was ? " Plaintiff said, " At least $30,000 ; " to which Porter replied, " Oh, no ! " Plaintiff then asked what the word " missing," written in the book, meant. Porter said, " Vouchers I could not find." Plaintiff said, " You have made another mistake with my account, as you did once before, giving somebody else credit for my

moneys." Porter said, "I think not, but I will look." Plaintiff said, "Well, you look and find." In saying to Porter that he had made a mistake, as he did once before, plaintiff referred to a previous occasion when deposits he had made were credited to another depositor with the bank, named Lot C. Clark, presumably through a similarity in the initials "L" and "T" of the first names of the two depositors. For a year, or a year and a half, after this interview between the plaintiff and the book-keeper, plaintiff called from time to time at the bank, and was told by Porter that he would get the vouchers; that he had them. At length plaintiff went to the president of the bank, Mr. Knapp (since dead), and said, "Your folks have been muddling my account here terribly, charging me with money I have never drawn for." The president took him by the arm, led him to Porter, and said to the latter, "Mr. Clark says you have been charging his account with amounts for which he has drawn no checks." "Oh, no," said Porter; "but when I was balancing my book I could not put my hand on them. When I get them I will give them to him." The president then slapped the plaintiff on the shoulder, in his usual sociable way, and said, "Well, Tom, when he gets them he will give them to you." The plaintiff replied, "Oh, well, the trouble is, if he has any such vouchers they are not mine." The president said, "Oh, well, they will be the best proof." The plaintiff after that time kept going to the book-keeper from month to month, and from year to year, until 1875. He was always told they had the vouchers, and were going to give them to him. They never said they could not find them. At last, "near the end of the race," the plaintiff told the book-keeper that he was sick of this; that if he ever had such vouchers they were not his. On one occasion the new president told him he was sorry to be compelled to say that he came there too often about that matter. The plaintiff said, "That is true; I have." The president told him they were not bound to return his vouchers; upon which the plaintiff made a demand by drawing a check for the whole amount of the missing vouchers, $27,149 90, which he pre-

sented to the bank, and payment being refused, brought this action.

" The plaintiff did not upon his direct examination state whether he had or had not drawn any of the twenty-three missing checks. Having in his possession and producing as part of his proof his pass-book, in which he was credited by the bank with the deposits he had made, it was probably deemed sufficient to let the case rest upon the testimony he had given, and leave upon the bank the burden and duty of proving that the checks charged against him were his. Upon his cross-examination, however, by the counsel for the defendant, the following questions were asked and answers given :—

" Q. The first twenty-three checks there are those checks which you claim were fraudulently entered by the bank ; are those the charges which you claim are fraudulent?

" A. The amounts are amounts for which I never drew them.

" Q. Suppose you call off those amounts?

" A. (*Given by the plaintiff with the pass-book in his hand, from which he read off the checks marked " missing.*")

| $769 81 | $400 | $473 |
|---------|------|------|
| 326 | 1032 | 544 |
| 92 | 416 | 636 |
| 7000 | 119 46 | 7500 |
| 1000 | 777 | 271 |
| 702 | 105 | 714 |
| 426 | 1300 | 410 63 |
| 936 | 1200 | |

" This, the only evidence given by the plaintiff on the subject, appears to be not so much a denial of having drawn checks corresponding in number with those charged in the pass-book, but of having drawn for the amounts charged; and seems to be an allegation that the checks he actually did draw had been fraudulently altered, or had been charged against him in amounts other than the correct ones. But whether his statements were intended as a denial that he drew more than the forty-nine checks returned with the

book, or as an assertion that twenty-three out of the seventy-two charged against him on that balance had been altered, it was not unreasonable to expect from him some evidence as to what checks he had drawn prior to the date of that balance.   Singularly enough, plaintiff could not furnish that information.   His unsupported assertion was all he had to sustain his claim.   He kept no check-book; he had kept none since the year 1860.   His reason for this course—an unusual one for a merchant—was, that having always found his check-book and the account kept by the bank tally, he concluded that it was not necessary for him to keep any account of the checks he drew.   He was accustomed to draw his checks on blanks which he picked up at the bank when he went to make deposits, or upon blanks borrowed from persons in whose stores he happened to be when he wished to draw a check, or upon sheets of common foolscap paper, when no blanks were procurable.   He kept no list of the checks he drew, and relied upon his memory for knowledge of his balance.   But the most extraordinary and unfortunate circumstance was, that although doing more of a wholesale than a retail business during this time, he kept no books from which could be ascertained what payments he had made in his business ; in fact made no entries of payments in any book or account whatever.   But for this fact, it might be gathered from his accounts whether during the period ending September 14, 1865, he had made payments corresponding to the checks received by the bank.   He had no receipts for moneys paid during that period, for such papers and books as he possessed at the time had been stored by him in the upper part of the store in Amity Street when he sold out his interest in 1865, and, as he learned upon inquiring for them several years afterwards, had been sold to a pedler for old paper.

   " The burden of proving that the missing checks were his rested on the bank, a burden not lightened by the fact that, when the action was commenced, nearly eleven years had elapsed since those checks passed through the hands of its officers; that at the time of the trial the president of the bank, Mr. Knapp, and the paying-teller, who could identify

the plaintiff's signature, were dead. The check-list books of the bank for the year 1864 were produced, from which it appeared that checks corresponding in amount to those charged in the pass-book of the plaintiff, and marked "missing," had been received on successive days from July 14th to October 19th, 1864, and paid by the bank, either through the paying-teller or from the clearing house, or in deposits of other dealers with the receiving-teller. The following list shows the amounts with the dates and sources of such checks, and no other checks of plaintiff were received and paid between July 14th and October 19th of that year, a period of over three months, during which time the plaintiff was actually engaged in business, and making payments in the course of it:—

| Amount of Check. | Date of entry of check in the check-list. | Whence received. |
|---|---|---|
| $769 81 | July 14th, 1864. | Ocean Bank. |
| 400 | " " | |
| 473 | " " | North River Bank. |
| 326 | August 6th, " | Chemical " |
| 544 | " 17 " | Ocean " |
| 1032 | " 8 " | North River " |
| 92 | " 31 " | Market " |
| 416 | Sept. 6 " | Manhattan " |
| 636 | " 12 " | North River " |
| 119 46 | " 13 " | East River " |
| 7000 | " " " | Paying-Teller " |
| 7500 | " 14 " | Receiving " " |
| 1000 | " 15 " | Marine " |
| 777 | " 16 " | Ocean " |
| 271 | " 17 " | East River " |
| 702 | " 22 " | |
| 105 | " 26 " | Ocean " |
| 714 | " 27 " | Marine " |
| 426 | October 6 " | Ocean " |
| 1300 | " 10 " | North River " |
| 410 63 | " " | |
| 936 | " 13 " | North River " |
| 1200 | " 19 " | Ocean " |

" Of these twenty-three entries in the check-list, eleven were made by a clerk named Denniston, eight by a clerk named Hoffmann, and four by a clerk named Brinkerhoff. Denniston has been in the employ of the bank twenty-one years; Hoffman, twenty-five years; Brinkerhoff, fourteen years. Each was placed on the stand, and identified the entries made by him, and swore that they were made at their respective dates, and in the regular course of business, from checks actually received at the bank in the regular course. It also appeared that the checks from which the entries in the check-list were made were received by the witnesses from the paying-teller, to whom all checks were handed before being so entered, in order that the signatures might be scrutinized, no checks being entered save those passed as correct by the paying-teller. After the amounts of the checks, and the sources whence they came (if through the clearing house) were thus entered in the check-list, the check clerks each day sorted the checks according to dealers, collected all of each drawer together, and entered them with the name of the drawer, and the amount, in what is called the debit book. The debit books of the bank for 1864 were produced, in which these twenty-three vouchers appeared charged to Thomas C. Clark, the plaintiff, as drawer, in the same order in which they appeared on the check-list and on corresponding dates. Of the entries in the debit book, nineteen were made by Hoffman, and four by Brinckerhoff. These witnesses swore that the entries were made from the actual checks drawn by Thomas C. Clark, were made on the day of the date of the entries, and in the regular course of business. That they were so made in the regular course of business appeared from both books in which many thousands of checks were entered between the dates above mentioned. Hoffman, who had been in the bank for eleven years at that time, knew the plaintiff's signature, and recognized the plaintiff's signature to the checks as he entered them. He entered all the checks except the four following:

August 31st, $92; September 9th, $416.

Sept. 16th,    777;    "    17th,    271.

These four were entered by Brinckerhoff, who had then been several years in the bank, and swears that the entries were made from the checks signed " Thomas C. Clark," which he then and now believes to have been drawn by the plaintiff, whose checks he had handled in like manner before. After the checks were so entered in the debit book they were handed (sorted as to dealers, in the manner above stated) to the respective book-keepers in the bank, by whom they were placed in the pigeon-holes appropriately lettered to receive them ; those of the plaintiff being handed to the book-keeper, Porter, and placed in pigeon-hole " C." The entries in the ledger of the bank where the accounts of the dealers were kept were made from the debit book each day, and not from the checks, the latter not being disturbed in the pigeon-holes until the dealer's account was to be written up, when they were taken out by the book-keeper and handed to his assistant, to be entered in the pass-book of the depositor. To balance the pass-book the entries in the ledger are compared with the entries so made by the assistant book-keeper, and, if correct, the balance is struck. This course was pursued with the twenty-three checks in question ; they were entered in the plaintiff's pass-book when it was handed in to be balanced by Charles H. Wright, assistant book-keeper, and now assistant receiving-teller of the bank. He was called as a witness, and identified his handwriting in the plaintiff's pass-book, and swore that he made the list from checks handed him by the book-keeper, Mr. Porter, which checks were signed " Thomas C. Clark." Mr. Porter was called as a witness, and swore that he was a custodian of the checks after they had been handed to him by the check clerks, who had entered them in the debit book ; that in the regular course of business, when plaintiff's pass-book was to be written up, he handed them to Mr. Wright, his assistant, who entered them in the pass-book, and then the vouchers and book were handed back to him by Wright ; it was after this that the vouchers were lost ; how or when he does not know ; that the plaintiff did not make any objection when the pass-book was handed to him and balanced,

with forty-nine vouchers only returned, · and twenty-three marked "missing;" and that the plaintiff made no objection until 1874.

"From the books of the bank it thus appears that the disputed checks were ·received in the ordinary course of business in the bank, with, as before remarked, thousands of other checks of other dealers,.and entered.in regular order daily as received in the regular record of the bank·; that there was nothing unusual or singular about these entries by which to distinguish them from any other entry.   It also appears by the evidence that each check was examined and scrutinized by the paying-teller, Mr. Cooke, by Hoffman and Brinckerhoff, who entered them in the debit book ; by Hoffman, Brinckerhoff and Denniston, who entered them in the check list, and by Wright, who entered them in the.pass-book. ' That these twenty-three checks were actually in existence, and in the custody of the bank, and ·had· passed the scrutiny of two experts, and had been each entered three times in different books up to the 19th day of October, 1864, admits of no doubt.

"The plaintiff had unfortunately not preserved all of the forty-nine checks which he received at the time his book was balanced; so that it could not be ascertained whether any of them were drawn during the three months that the missing checks had been received and paid by the bank.   In fact, the extraordinary part of the case is, that the plaintiff, assuming him to have·been the victim of an almost unparalleled fraud, by which for three months every check presented with his signature to the bank had been altered, had taken not the slightest care to preserve a single document, or book, or record, by which ·he could ·satisfactorily establish that no checks of those amounts were drawn by him.   A mere suggestion or hint was drawn out on plaintiff's behalf at the trial, that certain checks actually drawn by the plaintiff during the period in question had been altered by some unknown rogue ;· but no evidence whatever was offered to sustain it.

"The plaintiff thus confessing to a carelessness and indif-

ference which ill accords with a gravity of the matter in question, having no record of checks drawn, or payments made by him, offers by his unsupported oath, after thirteen years and upwards, but feeble evidence to rebut the records of the bank, and the testimony of its officers. Fortunately, the case does not depend upon that evidence alone. Proof was adduced by the bank that destroyed the whole fabric of the plaintiff's claim.

" Demarest & Wygant, a firm of merchants doing business in this city in and prior to the year 1864, sold goods to the plaintiff prior to September, 1864. They kept an account in the North River Bank, and were accustomed to deposit there checks and money received in their business. Their books show that plaintiff paid them $636 on Saturday, November 10, 1864, and the books of the North River Bank show a deposit by them on that day of $2081 55. On the following Monday the Mechanics' National Bank received from the North River Bank through the clearing house a check of Thomas C. Clark for $636, which they paid and charged against him. It is one of the disputed vouchers, and is charged on September 12, 1864.

" Demarest & Wygant's books show a payment by plaintiff to them of $936 on October 12, 1864, for goods sold him. A deposit of $1624 in the North River Bank by them on the same day is proved by the book of the bank. On the next day a check of Thomas C. Clark for $936 comes to the Mechanics' National Bank through the clearing house from the North River Bank, is paid and charged to plaintiff. It is one of the disputed vouchers, and is charged on October 13, 1864.

" The dealings between plaintiff and Demarest & Wygant are not disputed; and Mr. Wygant and his book-keeper, Mr. Webb, produce their books, showing the payment of these sums on the dates above given. Such payments are not disputed by the plaintiff. The deposits in the North River Bank are of sums large enough to include such payments each day; the plaintiff was in the habit of paying by checks; the checks charged against plaintiff by defendant on Septem-

ber 12th and October 12th, are of the exact amount of such payments made by plaintiff, and came in the regular course of business from Demarest & Wygant's bank through the clearing house to plaintiff's bank for collection. These two checks plaintiff declared to be fraudulent in the sweeping denial he made as to all the missing vouchers. Yet the chain of evidence of their genuineness seems complete, and to overturn the case of plaintiff, resting on his unsupported oath, and depending upon his recollection, both as regards the two checks in question and all the checks disputed, since the accuracy and correctness of defendant's books, and the truthfulness and credibility of their clerks, who identified all the vouchers, are established, and plaintiff convicted of an untruth on a material point, as to which he assumed to speak with positiveness, and as to which it seems to me, looking at the character of his claim, he could not be mistaken.

Further evidence of a similar, if not so strong, character was also produced by defendant. It was proved that the plaintiff, in 1864 and previously, was in the habit of buying goods from Kingsland & Comstock, merchants, in this city. The book-keeper of the firm, James C. Comstock, was called, and testified that they deposited moneys and checks received in the course of their business with the Marine Bank. He identified a deposit ticket made by himself, which accompanied a deposit of that firm in the Marine Bank on September 26th, 1864.

Among the checks deposited was one of $714. The next day a check of $714, signed Thomas C. Clark, was received by the Mechanics' Bank from the Marine Bank through the clearing house in the regular course of business, was paid and charged to plaintiff. It is one of the missing vouchers, and is charged on September 27th, the day it was paid. In this and in the following cases the identity of amount, of deposit, and of subsequent presentation by the bank of deposit, establish the existence of actual checks, and corroborate defendant's clerks. No attempt was made by plaintiff to show that he made no such payments to Kingsland & Comstock, or to

the prices mentioned in the next two cases.   He offered no testimony on the subject.

One of the disputed checks, $92, charged on August 31st, 1864, as received from the Market Bank, is similarly connected with a deposit of a check of $92 in that bank, on August 30th, 1864, by A. J. Sayre & Co., merchants, who were then selling goods to the plaintiff.

Another check of $271 charged among the disputed vouchers as of September 17th, and as received from the East River Bank, corresponds in amount with one deposit in that bank the day before, by Meyer & Strauss, butchers, who were then selling beef to the plaintiff.

The identity in amount of a check received by the defendant one day from a certain bank, with a check deposited in that bank the day before, by a merchant dealing with the plaintiff, is of the highest significance, when we find the defendant's clerk entering the check so received, on the day of its reception, as a check of the plaintiff, in its debit book, in the regular course of business; the clerks who made the entry swearing positively that the checks were charged to the drawer.   But in the case of the payments made to Demarest & Wygant by the plaintiff, and their deposits in the North River Bank on the same day, and the appearance in the regular course in the defendant's hands of checks for amounts identical with those payments received from the North River Bank, the proof may be said to demonstrate the falsity of the plaintiff's testimony in respect of such checks.

" In the face of this proof the jury gave the plaintiff a verdict for the full amount of his claim, not even deducting the amounts traced to the plaintiff through the books of Demarest & Wygant and the North River Bank.   This verdict must be due to a mistake on the part of the jury as to the issue involved in the case.   They could not have thoroughly comprehended the instruction, that they were to ascertain whether these missing vouchers, or any of them, had been drawn by the plaintiff.   They must, on the contrary, have supposed that the bank was entitled to no allowance for a genuine check which had been lost.

" Much might be said of the gross improbability of the plaintiff suffering a deprivation of the use of this large sum, $27,149 90, for ten years, namely : from September 14, 1865, to the time of the demand, if he had been actually defrauded ; of his suffering the loss of interest on this sum, amounting for all those years to nearly as much as the principal (for while he forebore to make a demand, interest did not run on his deposit) ; of his knowing a gigantic fraud had been perpetrated on him by the bank, or some other party, and yet continuing to deal with the bank for ten years longer, not insisting upon some record of a protest against the charge, and permitting twenty-three successive balances to be made in his book on the basis of an over-charge ; of his suffering his books, papers and receipts, which might throw some light on those questions, to be lost and scattered ; and of his forbearing to demand an instant and rigorous investigation the moment that $27,149 90 more than he had drawn was charged against him ; but this, and many other circumstances that distinguish this bold claim, will readily suggest themselves to all who study the facts.  Not the least mysterious circumstance is the disappearance in bulk of the twenty-three checks in dispute.  A careful examination of the testimony shows that the plaintiff may have had access, as well as the bank officers, to these vouchers.  The state of the pass-book shows that when they were written in it they were apparently the only vouchers the bank then had, and were entered so as to strike a balance upon the account as it then stood, and the date when the last one was received at the bank, about four months after the preceding balance of the book, corresponds with about the period that the book was handed in by the plaintiff to be balanced. When the checks were entered by Wright, the assistant book-keeper, they were returned by him to the book-keeper, to be compared with the ledger, and to have the book balanced.  Who had access to the book after that time ?  The book-keeper, and the plaintiff also, for he came to get it from the book-keeper whenever he wished to make a deposit, a circumstance that repeatedly occurred during the months

that the book remained unbalanced. There is no proof that the book with those vouchers in it were at any such time handed to him by mistake, the book not being balanced. But that he had the book from the book-keeper several times to make deposits, handing it back again after making each deposit, is his own evidence, and the displacing and loss of the vouchers might easily occur from this frequent taking away of the book after it had been left with Porter to be balanced. The lost vouchers were the consecutive checks for three months, and most probably disappeared in bulk. If any of these were fraudulently altered by some unknown rogue, it was not, at the time they were marked "missing" in the pass-book, the interest of any person in the bank to make away with them, for they were not then in dispute. Suspicion cannot attach to the officers or clerks of the bank more than to the plaintiff. No proof whatever was offered to fasten upon any person whatever the least taint of suspicion as to forgery of checks in the first place, or abstraction of them afterwards.

"I regard the evidence as to the payments to Demarest & Wygant as tracing two of the disputed vouchers to plaintiff and contradicting and impeaching his evidence, on which alone his case rests. Perhaps the proof required that the jury should have been instructed that as plaintiff's testimony was thus impeached his case must fail; but at least the verdict of the jury for the whole amount of his claim, including those checks, was, as before remarked, rendered upon a mistake and cannot be sustained.

"A new trial is therefore ordered, with costs to abide the event."

*William A. Beach*, for appellant.

*William H. Scott*, for respondent.

CHARLES P. DALY, Chief Justice.—The appellant claims that under the amended Code (§ 999) the judge who tries the cause has no power to set aside a verdict as against the weight of evidence on a motion made upon his minutes; that

the provision that he may entertain such a motion when the verdict is "*contrary to the evidence*" does not mean where it is *against the weight of evidence.* There has long been a well-recognized distinction between verdicts which are simply against evidence and those which are against the *weight* of evidence. The first embraces cases in which there is no evidence to sustain the verdict, the other, cases where there is, but where the weight of the evidence is so overwhelming as to call upon the court, in the exercise of a sound discretion, to set aside the verdict,—a discretion exercised only in extreme cases, from the great regard which is due, under the constitution and laws, to the unanimous decision of a jury upon a question of fact. This distinction is not expressed in words in § 999, but the language "contrary to evidence" is, in my opinion, broad enough to cover it; and I agree in the suggestion of the respondent that, in the passage "contrary to *evidence,* or contrary to law," the language "*contrary to evidence*" is used antithetically to the expression "contrary to law," and was meant to embrace any case in which a motion for a new trial can be made upon the evidence in the cause, as contradistinguished from errors of law. (See *Cheney* v. *N. Y. C. & H. R. R. R. Co.*, 16 Hun, 415.)

The manifest object of this provision, introduced in the Code in 1851, was to relieve the party aggrieved from the trouble, delay and expense of making up a case, by allowing him during the term, whilst the facts were still fresh in the judge's recollection, to move for a new trial on the judge's minutes, upon any one of the grounds specified in that section ; and if the relief sought under it involved a review of the evidence, to give him all the advantage that he would have in reviewing the evidence upon a case. As the provision originally stood in 1851 the language was, "or as being against evidence, or for insufficient evidence." In 1852 it was changed to "or for insufficient evidence," which the last revisors (1877) changed to "or contrary to the evidence."

Judge Woodruff, in *Alges* v. *Duncan* (7 Transcp. App. 167), was of opinion that there was an inherent power in the judge at *nisi prius* to set aside a verdict if it was against

law, or unwarranted by the evidence, or against his positive instructions, without the delay and expense of making up a case; but it was settled in *Tinson* v. *Welsh* (3 Robt. 392; affirmed 51 N. Y. 244) that a motion for a new trial on the judge's minutes could only be made in the mode, and in the cases specified in the Code. That was a trial in which the evidence was conflicting, but in which, in the opinion of the general term of the court below, there was no such preponderance as would justify the court in setting aside the verdict as against the weight of evidence; but the order was reversed upon the ground that there was no authority under the Code or otherwise for a motion upon the judge's minutes to set aside a verdict because it was against the instruction of the court. As the court below reviewed and passed upon the question of the weight of evidence, it is very evident that they considered that such a motion could be made under the section, and I am not aware that it has ever occurred to any one before the last amendment that this section was to be construed as allowing the motion to be made on the judge's minutes for a new trial if the verdict was against evidence, or for insufficient evidence, but if it was against the *weight of evidence* that the motion could be made only upon a case.

No such distinction was ever raised in this court, where many such motions have been made since 1851 under this provision upon the judge's minutes, and I see nothing in the substitution in 1877 of the word " *contrary* " for the previous words " *against* " or " *insufficient*," that makes any material difference in this respect.

Taking the whole of Judge JOSEPH F. DALY'S opinion together, I do not understand that he ordered a new trial solely upon the ground that the jury had made a mistake in allowing the plaintiff to recover for the two amounts embraced in the checks deposited by Demarest & Wygant in the North River Bank, and paid on the following day by the defendant's bank through the clearing house; but that he referred to these two payments by the plaintiff as contradicting and impeaching his evidence so clearly, that a case resting solely on his testimony should not be sus-

Clark v. The Mechanics' National Bank of the City of New York.

tained, *or*, *at least*, as showing that a verdict by the jury for the whole amount was a mistake. But if he had, I do not concede that it was held in the cases on which the appellant relies (*Morse* v. *Sherrill*, 63 Barb. 21 ; *Tinson* v. *Welsh*, 51 N. Y. 244), that the revisory jurisdiction of the appellate tribunal is limited to a review only of the grounds upon which the court below ordered a new trial. In the first of these cases there is nothing in the remarks of the court referring to any such rule, and nothing in the decision from which such a rule is to be deduced ; and in the last case, the application for a new trial was moved for upon the judge's minutes, upon the ground that the verdict was against the instruction of the judge, as appears by the recital in the order granting the new trial, which order was reversed for the reason that the Code (§ 264 ; amended, § 999) gave no authority in such a case to grant a new trial on the judge's minutes, the decision being nothing more than that a new trial cannot be moved for upon the judge's minutes, except in the cases specified in the Code, that is, upon exceptions, or because the damages are excessive or insufficient, or the verdict is contrary to the evidence or contrary to law. In the present case, the motion for a new trial, as appears by the notice of motion, was for excessive damages, and because the verdict was " *contrary* to and against the *weight* of evidence, and otherwise contrary to the evidence and the law," and the order is simply that " the said motion be, and the same hereby is, granted," so that the order must be affirmed if any one of the grounds specified in the notice was good.

In my opinion, this was one of those extreme cases in which the discretion of the court to order a new trial, where there has been conflicting testimony, was properly exercised. I feel as fully as the counsel for the appellant has expressed it, that this is a power to be discreetly exercised, in view of the weight that is to be attached to the verdict of a jury upon a fair trial. I have frequently, in opinions hereto delivered, expressed, as the result of a long experience, my high estimate of the verdicts of juries in general; of the great value I attach to that mode of determining questions of fact,

and that the conclusion of twelve disinterested men, upon what is merely a question of fact is entitled to so much weight that it is not to be set aside because the judge who tried the cause, or the judges who sat in review, are of the opinion that, upon the facts, the verdict ought to have been otherwise. But juries are not infallible. They are, individually and collectively, subject to the ordinary infirmities of human nature, and cases do occur where, if the court did not interpose and set aside the verdict, it would amount to a denial of justice. By doing so no right is taken away. The effect of setting aside the verdict is simply to subject the case to further consideration by another jury, and even this has its limits; for, if the question be one of fact upon which the testimony is conflicting, the court will, after three trials with the same result, refuse, at least in this State, to interfere any further with the verdict. (*Fowler* v. *Ætna Ins. Co.*, 7 Wend. 270; *Talcot* v. *Commercial, &c., Ins. Co.*, 2 Johns. 124.)

This supervisory authority over the verdict of a jury, even upon a question of fact, is a most salutary one, and in the language of Graham, no lover of justice would wish to see it crippled or narrowed, as it might otherwise be in the power of juries to trample upon justice. (Graham on New Trials, 537.) In respect to the limitation upon its exercise, I fully subscribe to all that was said by Judge Potter in the case to which the appellant has called our attention (*Morse* v. *Sherrill*, 63 Barb. 27). In my judgment, this case comes exactly within the rule laid down by him as follows: where the verdict " is so against a striking preponderance of the evidence, that a common exercise of judgment demands its reversal."

The judge below has shown this so clearly and fully in the elaborate opinion delivered by him, as to make it unnecessary for us to go over the case in detail, the testimony in which embraces more than 300 printed pages, as it would be but to re-enumerate the evidence as he has presented it, and repeat respecting it what he has said. I shall therefore merely state the leading points in a summary way. The verdict, which is for $31,874 73, rests solely upon an oral statement made by the plaintiff, as a witness on his own behalf,

which is not only intrinsically improbable in itself, but is in conflict with the rest of the testimony in the case. The appellant insists that the plaintiff's statement is supported by the consideration that there may have been a motive on the part of the bank or its officers to suppress the missing checks, because, if they were forged, the loss arising from paying them would fall upon the bank, in respect to which it is sufficient to say that the defendant's evidence can, in the like manner, be supported by the consideration that the missing checks may have been lost or abstracted through the plaintiff's instrumentality, as they were picked out by the book-keeper, Porter, and handed to the assistant receiving-teller, for the purpose of being written up in the plaintiff's pass-book, and returned to the book-keeper, the plaintiff having constant access to his bank-book, which was left by him in the bank, and called for whenever he wanted to make a deposit. The intrinsic improbability of the plaintiff's statement is, that after his attention was called to the fact in 1865, by the entries and balance of his book in that year, that twenty-three of the vouchers for payments on his account by the bank, between July 12th and October 19th, 1864, to the amount of $27,149 90, were missing, that he suffered this large amount to remain in the bank, drawing no interest for eleven years, when the interest upon it would be nearly equal to the principal, without making any formal demand of it from the bank, or taking any steps to enforce the payment of it, although during the whole of that time he continued to be a customer of the bank, and his bank-book during that period had been balanced *twenty-three times.*

Though the plaintiff was in business in this city, as a wholesale and retail grocer, doing, as he says, a large business during the period when these missing checks were paid, he, according to his account, kept no cash-book, and made no entry of his payments in any book, because, he says, as a general rule, he paid for what he bought in cash, and would only sometimes give a check; and he can give no account of any of his business transactions from July 12th to October 19th, 1864, on the ground that all his books and papers dur-

ing that period are lost, a period during which the bank paid out $27,149 90 on what purported to be checks drawn by him, the paying-teller of the bank who received and paid them as genuine being now dead, and the president of the bank being also dead, to whom the plaintiff said he complained (a year and a half after the book-keeper had been promising to produce the missing checks) that the bank had been charging him with moneys that he had never drawn for, upon which, he says, the president went with him to the book-keeper, and the book-keeper said that he would give him the checks when he could put his hand on them, all of which the book-keeper denies, swearing that the plaintiff never made any complaint about the missing checks until ten years after they were entered as missing in the plaintiff's passbook.

That these checks were received and paid in the ordinary course of business appears by the books of the bank, kept as the record of its daily transactions, and their existence is proved by the testimony of the book-keeper, the assistant receiving-teller, and a check clerk.

The plaintiff does not swear that he did not draw these missing checks, his testimony being that the amounts are amounts for which he never drew them, leaving the inference that some unknown person had fraudulently altered them, for he avoids distinctly swearing that he did not draw the checks, which is subject to the suspicion suggested by the respondent, that his testimony was guarded in this respect, to avoid the hazard he might incur if the checks or some of them should be found, and shown to be in his handwriting, a circumstance to which the judge below attaches peculiar significance.

That two of these missing checks were given in payment of amounts due by him to a firm with which at the time he was dealing was proved by evidence of the most conclusive character, and there was evidence, though not as complete in its character, indicating that three other of the missing checks had been given in payment of claims due by him to persons with whom, at that time, he dealt.

It was shown by the check clerk of the bank at that time, who had entered the bulk of the plaintiff's checks from the time that he opened his account eight years before, and who had therefore become familiar with the plaintiff's handwriting and knew his signature, that this clerk received nineteen of these missing checks in the regular course of business, and entered them, the signatures of which he recognized at the time to be in the handwriting of the plaintiff, and that they came to him from the paying-teller, who is now dead, by whom they had been previously examined and passed, and that the remaining four missing checks came into the possession of the assistant paying-teller, being received by him in the regular course of business from the paying-teller, and entered by him at the dates when they were received, the signatures to which he then, and at the trial, believed to have been in the handwriting of the plaintiff, he also being familiar with the plaintiff's handwriting. To which is to be added the testimony of the book-keeper, that when the plaintiff received his bank-book balanced, with the twenty-three checks marked as missing, and received with it the remaining forty-nine vouchers, the plaintiff received the book and the vouchers without making any objection then, or at any other time, until ten years afterwards, as before stated.

At the period when these missing checks were paid, the plaintiff was a man in comparative affluence, but at the time of the trial had become so reduced as to have no property except what he wore upon his person. A judgment was recovered against him, which remains unpaid, and under which he was examined on supplementary proceedings to ascertain whether he had any property to be applied towards the payment of it, in which examination he did not disclose that he had this large claim against the bank, being asked, as he said, only whether he had any real estate, implying thereby that the usual inquiries to ascertain whether the judgment debtor had any personal property, was not made in his case.

This preponderance of testimony, and the character of it, is so striking, and, in my opinion, so overwhelming, that it is impossible to account for the verdict of the jury, except

upon the ground of bias against the defendants as a banking institution, upon some such assumption as that, being a bank, they should be held responsible for this large amount if they could not produce the original vouchers to show that they had paid it.

The order granting a new trial, in my opinion, should be affirmed.

LARREMORE and VAN HOESEN, JJ., concurred.