WILLIAM McCARTHY, Plaintiff, *against* THE CHRISTOPHER & TENTH STREET RAILROAD COMPANY, Defendant.

[SPECIAL TERM.]

(Decided June, 1882.)

The court has power, on motion of a defendant, after a verdict against him, to set aside the verdict as against the weight of evidence, although he did not move, at the close of the testimony, for a direction in his favor, or for a dismissal of the complaint.

Upon the trial of an action to recover damages for injuries to the person of the plaintiff, alleged to have been caused by the defendant's negligence, the plaintiff and two witnesses on his behalf, both connected with him in some way, testified to circumstances showing negligence on the part of the defendant, and freedom from negligence on the part of the plaintiff; the main features of their testimony bearing a striking resemblance. They were directly contradicted by five witnesses on behalf of the defendant, four of whom were disinterested, and no one of whom was impeached or shaken by cross-examination; all of them were spectators of the occurrence in question, and gave an account of it that was clear, consistent, and reasonable; and two other persons, both disinterested and respectable, testified that the plaintiff himself, on two different occasions, before suit brought, made to them statements that not only contradicted his testimony at the trial, but confirmed with great circumstantiality and exactness the testimony given by the other witnesses for the defendant. *Held*, that a verdict for the plaintiff was in conflict with the overwhelming weight of evidence, and should be set aside.

MOTION to set aside the verdict of a jury, and grant a new trial.

McCarthy *v.* Christopher and Tenth Street R. R. Co.

The action was brought to recover the sum of $25,000 as damages for personal injuries alleged to have been sustained by the plaintiff by reason of negligence on the part of the defendant. The jury found a verdict for the plaintiff for $4,500, which the defendant moved to set aside as against the weight of evidence.

Van Hoesen, J.—This court has already decided that the Code of · Civil Procedure was not intended to deprive the courts of the power to set aside verdicts that are against the weight of evidence (*Clark* v. *Mechanics' Bank,* 8 Daly, 501). It is not proper for me to enter into any discussion as to the correctness of that decision, but I must not be understood as doubting it. It is said, however, that the verdict cannot be set aside, inasmuch as the defendant did not move, at the close of all the testimony, for a direction in his favor, or for the dismissal of the complaint. There is one case in the Supreme Court, and there are several cases in the Superior Court, that so lay down the law, but these are innovations upon the settled practice in this state and cannot be recognized as of any authority.

The case in the Supreme Court (*Peake* v. *Bell,* 7 Hun, 454) has been directly overruled by the more recent and much better considered case of *Shearman* v. *Henderson* (12 Hun, 170). The cases in the Superior Court seem to me to overlook the obvious distinction between the right to a judgment upon evidence that is virtually all one way, and the right to a fair, unbiassed and honest decision by a jury upon testimony that is conflicting. When a verdict is set aside as against the weight of evidence, the court gives no final judgment, but simply orders a new trial. It does not dispose of the case, nor adjudge that as matter of law either party is entitled to judgment, but it decides that the party against whom the verdict was rendered has not had his case properly considered by the jury, because bias, passion, mistake or corruption has led the jury to give a verdict that offends common sense or common honesty. Where a court, at the trial, directs a verdict or dismisses a complaint, it is because all the evidence worthy of consideration is in favor of the prevailing party. Where the

evidence is contradictory, of what avail is it to move the court to direct a verdict or to dismiss a complaint? The court cannot lawfully grant the motion ; it is bound to submit the conflicting evidence to the jury. The utmost it can do is to set aside the verdict if it be obvious that the evidence was so improperly weighed that there will be a gross miscarriage of justice if a new trial be not had. It is said that the evidence is the same before the verdict as after, and that if the verdict will be against the evidence if the jury find in a certain way, why should not the attention of the court be called to that fact before the parties take the chances of the jury's finding? The answer is that the court is powerless to direct a verdict, even though it should consider it clear that the jury ought to find in a certain way. It is bound to submit conflicting testimony to the jury. A motion to direct a verdict where the evidence is contradictory is idle. Why should a party be compelled to submit to a verdict that is the result of passion or prejudice because he fails to make a motion that the court has no power to grant?

I know that a judge has no right to set aside a verdict merely because he would have found differently if the decision of the case had fallen to him. It is the judgment of the jury, not the judgment of the judge, that suitors are entitled to, when a question of fact arises in an action at law. This our courts have always recognized. The infrequency of interference by the courts with verdicts attests at once the value of the jury system for the determination of questions of fact, and the reluctance of judges to trench upon the domain allotted to juries. I can recall only two cases in which judges of this court, in the last seven years, have felt it their duty to set aside verdicts—the case of *Hermann* v. *Kreppel*, reported in 8 Weekly Digest, and the case of *Clark* v. *The Mechanics' Bank*, reported in 8 Daly.

To those two it is my duty to add a third. I do so with firm confidence that I am arresting, for the time at least, a most iniquitous proceeding.

When the motion to set aside the verdict was made, I said that the case seemed to me to have been fabricated by a

McCarthy v. Christopher and Tenth Street R. R. Co.

lawyer. It seemed so because it was built with great attention to details, and in a workmanlike manner. No point was left uncovered. The absence of contributory negligence was proved by testimony that before attempting to cross the street, the plaintiff, a boy of thirteen, with a caution that his elders seldom possess, looked carefully both ways. There was nothing, he said, to prevent him from crossing at his ease, and he described the situation of the car that ran over him as near to Broadway at the time that he began to cross the street in front of Aberle's Theatre. The car was then so far away that he might have crossed two or three times at least before it reached the spot at which he was injured. The next objective point was to prove gross negligence on the part of the railroad company itself. The pavement adjacent to the track was, it was said, so much out of repair, through the fault of the company, that the plaintiff's foot was caught between the rail and a stone, and held as if in a vise, so that in endeavoring to extricate himself the plaintiff was thrown down. This testimony, it is evident, established negligence on the part of the company itself. But the negligence of the driver of the car was also to be proved, and this was done by testimony that he was driving his horse at a fast gallop, and not this alone, but also that he had his back turned from his horse, and his eyes fixed upon the interior of his car. So negligent was the driver said to have been that though the plaintiff struggled and squirmed in his efforts to get up, and called loudly on the driver to stop, no heed was given to him, but he was wantonly run over and crippled for life. The galloping of the horse accounted for the rapidity with which the car came to the place where the plaintiff was caught in the trap. The position of the driver and his preoccupation with the cash box or with a passenger accounted for his failure to see the plaintiff or hear his cries. Here again was negligence conclusively shown ; an unlawful rate of speed and neglect on the part of the driver to look after his horse. Now, it is not impossible that such preternatural care on the part of the boy, and such uncommon negligence on the part of the driver, and such a strange trapping of the boy's foot, may all have coexisted, but such a concurrence of circumstan-

McCarthy *v.* Christopher and Tenth Street R. R. Co.

ces favorable to a recovery is so unusual that it suggests scrutiny of the witnesses by whom the case is proved.

The plaintiff was the chief witness on his own behalf. He was a keen, cunning, plausible boy, and he told the story of his injury in the manner I have already described. His next witness was a man named McGinn, who married his (the plaintiff's) cousin. This witness did not swear that he had seen the accident, but he did swear that he saw the boy trip and fall on the track, though he saw no car until after the boy had received his injuries. The other witness was a woman named Kelly, who lived in the same house with the plaintiff. This woman swore that at the time of the accident she was engaged at washing windows at Clinton Hall. She said she was sitting in one of the windows, and was in the act of cleaning it. In answer to a question put by me, she said that her back was to the street, and that she was facing the window. She saw the boy leave the theatre, start across the street, trip on the pavement, fall, struggle, shout and disappear beneath the car, just as he himself described the occurrence. She saw the horse that drew the car come at a fast gallop, and in everything she corroborated the plaintiff.

In the main features of their testimony, there is a striking resemblance. Undoubtedly, if this testimony be true, the plaintiff was entitled to a verdict. Now it is to be observed that all the witnesses are connected in some way. The woman Kelly lived in the same house with the plaintiff. The man McGinn married his cousin. Both fortunately happened to be on the spot in such a position as see the boy fall. This is not impossible, but it is noticeable as a conjuncture of circumstances that supplied the plaintiff with witnesses from the circle of his immediate friends. No other witnesses of the accident were called by the plaintiff, though many persons were spectators of it.

On the part of the defendant there were four witnesses who saw the accident beside the driver of the car, Henshaw. These witnesses gave an account of the occurrence that was clear, consistent and reasonable throughout. Except the driver, they were all disinterested; and the remarkable fact in this

case is that the plaintiff himself, when in the hospital, before the idea of bringing a suit was suggested to his mind, gave to Dr. Burke, the attending physician, a history of the accident that agrees perfectly with the story told by the witnesses for the defendant. In the smallest details the history of the occurrence given by the plaintiff while he was in the hospital tallies with the testimony of Lynch, Giles, Murphy, Schwenger and Henshaw, the defendant's witnesses. The plaintiff told Dr. Burke that he and some other boys were standing on the steps of Aberle's Theatre "grubbing checks;" that some one of them said, "Cheese it; here comes a cop;" that they all ran across the street to elude the policeman; that he started to return to the side of the street from which he had run; that he had recrossed the track when he saw a policeman; that turning he saw Giles's truck; that he determined to screen himself behind it, and attempted to go in front of Giles's horses, and did not see the horse-car that was close upon him; that he ran accidentally against the horse of the car, and was knocked down and injured. This story is told by the plaintiff himself in the hospital, and by the defendant's witnesses on the trial. But this is not all. On the day after the accident the driver was taken to the hospital by policeman Moffitt, and then the boy said, "It was all my own fault; you could not help it." To this both the driver and the policeman, Moffitt, swore. How could he have said this if the driver was running his horse at a fast gallop, and keeping his face turned away from the track?

The only explanation that the plaintiff attempted to make was that at the hospital he was unconscious and "didn't know nothing."

Now, here we have a case in which the plaintiff is contradicted by five witnesses, four of whom are disinterested, and no one of whom was impeached or was shaken by the cross-examination; and we have the further and controlling fact that the plaintiff himself, on two different occasions, *ante litem motam*, made to different persons, both disinterested and respectable, a statement that not only contradicts his testimony at the trial, but confirms with great circumstantiality and ex-

actness the testimony given by the five witnesses for the defendant that were spectators of the accident.

There could have been no mistake on the part of Dr. Burke, or on the part of policeman Moffitt. Either they fabricated the statements that the plaintiff made to them, or else the plaintiff told the truth at the hospital. If he spoke the truth at the hospital his testimony at the trial was willfully false. If he swore truly at the trial, not only did Lynch, Giles, Murphy, Schwenger and Hernshaw commit willful perjury, but Moffitt and Dr. Burke deliberately concocted the most wicked falsehoods, by putting into the mouth of the plaintiff a story that he never told.

The verdict of the jury may well have been affected by certain proceedings that occurred at the trial. On the morning of the day on which the trial closed, the counsel for the defendant came to me out of court, bringing with him the counsel for the plaintiff, and disclosed the fact that one of the jury had called at his office and made proposals as to the verdict to be rendered. The counsel for the defendant drove the juror from his office, and then communicated the facts to the counsel for the plaintiff. It was agreed in my presence that the juror should be ordered to leave the box. The counsel for plaintiff asked that he might be permitted to move for the dismissal of the offending juror, and to this the counsel for the defendant imprudently, as I thought at the time, consented. Thereafter the counsel for the plaintiff, in the course of his address to the jury, strongly insinuated, though he did not clearly charge, that the defendant had attempted to corrupt that juror, and that providentially he had discovered the contemplated crime. It is highly probable that some of the jurymen went into the jury room with the conviction that the defendant was resorting to the heinous crime of embracery to compass the defeat of an honest and meritorious claim. Whatever the cause may have been, the jury clearly rendered a verdict that is in conflict with the overwhelming weight of evidence and with the story of the accident that the plaintiff himself told at the hospital to Dr. Burke and policeman Moffitt.

Leiegne *v.* Schwarzler.

It would be most unjust to allow the verdict to stand. Another jury may better administer justice. The jury were governed by partiality and prejudice, and were not guided by their reason, in giving the verdict, and I shall set it aside and order a new trial on the payment by the defendant of the costs of the last trial.

This is a fit occasion for repeating the words of Judge BRONSON, in *Conrad* v. *Williams* (6 Hill, 451) : " We do not often disturb the verdict of a jury on the ground that it is against evidence, but if it should not be done in a case like this, there is reason to fear that trial by jury would soon cease to be a blessing, and fall into discredit with the people."

Order accordingly.